# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>AN APPLE IPHONE DEVICE, CURRENTLY LOCATED<br>AT 1106 MAPLE STREET, GREENSBORO, NORTH<br>CAROLINA | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:24 MJ 424

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(g)(1) | Possession of a Firearm by a Previously Convicted Felon |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis for which is set forth on the attached sheet.

*Nicholas Ray Ingram*

*Applicant's signature*

Nicholas Ray Ingram, FBI-TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone after email w/ docmts *(specify reliable electronic means).*

Date: 10/31/24

*Judge's signature*

City and state: GSO, NC

L. Patrick Auld, USMJ

*Printed name and title*

## ATTACHMENT A

### *PROPERTY TO BE SEARCHED*

**The property to be searched is as follows:**

f.  A blue in color Apple iPhone seized during a traffic stop by the Greensboro Police Department, on October 15, 2024. This device was located approximately fifteen feet from the front passenger side door of a light-colored Mercedes C320, bearing North Carolina registration LCJ-7816, in which CUNNINGHAM was seated in the front passenger seat during a vehicle stop.

 

This warrant authorizes the forensic examination of TARGET DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### *INFORMATION TO BE SEIZED*

1.    All records on the TARGET DEVICE described in Attachment A that are evidence of violations of Title 18 U.S.C. §§ 922g, Felon in Possession of a Firearm, including:

    a.   Incoming and outgoing communications, including but not limited to calls, SMS messages, MMS messages, and any third-party application communications that reference firearms;

    b.   Photos, Videos, or other images taken or saved to the TARGET DEVICE, or audio recordings, including any voice messages or voicemails, which reference or reveal firearms;

    c.   Any and all information associated with applications downloaded to the TARGET DEVICE that concern firearms;

    d.   Any records or notes, including names and telephone numbers of persons who possessed firearms;

    e.   Any financial transaction history pertaining to firearm purchases or sales;

    f.   Cookies, internet sessions, and internet browsing history pertaining to firearms;

    g.   Evidence of the TARGET DEVICE's account owner/user's state of mind as it relates to the crimes under investigation, such as knowledge of the unlawfulness of firearm possession;

    h.   Information referencing or revealing firearms possession and sources of supply for firearms and ammunition (including names, addresses, phone numbers, or any other identifying information);

    i.   Any and all of the abovementioned files which were deleted.

2.      Evidence of user attribution showing who used or owned the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, browsing history, records of Internet Protocol addresses used, firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE DEVICE, CURRENTLY LOCATED AT 1106 MAPLE STREET, GREENSBORO, NORTH CAROLINA** | Case No. _1:24mJ424_ |

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION FOR A SEARCH WARRANT
### UNDER FED. R. CRIM. P. 41

I, Nicholas R. Ingram, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND TASK FORCE OFFICER BACKGROUND

I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of electronic devices, specifically an Apple iPhone, further described in Attachment A, which is currently in law enforcement possession at 1106 Maple Street, Greensboro, North Carolina, and the extraction from that property of electronically stored information described in Attachment B.

1.     I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18 of the United States Code.

2.     I am a Greensboro Police Officer and Federal Bureau of Investigation ("FBI") Task Force Officer.  I have been sworn as a Greensboro Police Officers since 2005 and further sworn as a FBI Task Force Officer ("TFO") since 2020.

3.     I am currently assigned to the Greensboro Police Department Criminal Investigations Division ("CID"), Robbery Investigations, as well as the Federal Bureau of Investigations' Safe Street Task Force.  As a Federal Bureau of Investigation Task Force Officer, I am tasked with

investigating various violent crimes including Hobbs Act Violation robberies as well as robberies and or thefts that occur at financial institutions and cases of illegal firearms possession.

4.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant. It neither sets forth all of my knowledge about this matter, nor describes every fact known to the government in connection with this investigation.

5.  The facts in this affidavit come from my personal observations, my training and experience, information obtained from police reports, other agents, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## STATUTORY AUTHORITY

This investigation concerns violations of 18 USC 922(g), Convicted Felon in Possession of a Firearm.

## IDENTIFICATION OF THE RECORDS TO BE EXAMINED

6.  The Apple iPhone currently in law enforcement custody to be searched ("TARGET DEVICES") is as follows and described in Attachment A:

> a.  A blue in color Apple iPhone, seized during the course of an investigation
>     following a traffic stop by the Greensboro Police Department, suspected to
>     belong to Isaiah Dequan Cunningham ("CUNNINGHAM"), as photographed:

 

## PROBABLE CAUSE

7.     On October 15, 2024, at approximately 12:05 am (EST) Greensboro Police Officers conducted a traffic stop of a light-colored Mercedes C320 bearing North Carolina registration LCJ-7816. The vehicle stop occurred near the intersection of East Market Street and North Murrow Boulevard, in Greensboro, North Carolina. The stop was conducted for a speeding violation, in violation of North Carolina General Statute 20-141.

8.     Greensboro Police Officers made contact with the occupants of the vehicle and identified the driver as Tyrone Jahmal Little ("Little"). The Officers identified what they believed to be an open container of alcoholic beverage inside of the passenger compartment of the vehicle, which is a violation of North Carolina General Statute 20-138.7.

9.     The Officers began to investigate further and requested that Little exit the vehicle. Little did so without incident and was escorted to the rear. By then, additional Officers arrived on scene and made contact with the rear left side passenger, who was identified as Darius Lamar Coleman ("Coleman"). Coleman was also asked to exit the vehicle and did so without incident.

10.     North Carolina Probation Officer ("NCPO") Felipe Foster ("Foster") was assisting Greensboro Police Officers with the stop. Foster, along with Corporal Shawn Fowler of the Greensboro Police Department, spoke with the front passenger.

11.     NCPO Foster asked the passenger, later identified as CUNNINGHAM, to exit the vehicle. Corporal Fowler's body worn camera ("BWC") was on and activated and recorded this encounter with CUNNINGHAM. The following describes what was captured by Corporal Fowler's BWC.

      b. As CUNNINGHAM began to exit, he turned and placed his feet outside the vehicle. However, his left hand was out of view of Corporal Fowler's BWC.

c. When CUNNINGHAM began to stand up, his left arm was still seen to be inside the vehicle.

d. NCPO Foster took a step back away from CUNNINGHAM. Following this, at least one gunshot is heard. The shot was fired by NCPO Foster.

e. Approximately 2 seconds later, NCPO Foster is heard on the BWC saying, "he pulled a gun."

12. Following this incident, CUNNINGHAM fled on foot. Officers pursued and gave clear commands to stop, saying he was under arrest. Officers lost sight of CUNNINGHAM for a few minutes, but eventually located him near AWOL Fitness located at 320 East Washington Street, Greensboro North Carolina (approximately .58 miles from the traffic stop). At the time of his discovery, CUNNINGHAM was suffering from an apparent gunshot injury to his leg. CUNNINGHAM was taken into custody.

13. Along CUNNINGHAM's path of flight, officers observed a pool of what appeared to be "fresh" blood in front of a business named "The Pointe," located at 503-D East Washington Street, Greensboro North Carolina, approximately 750 feet of where the traffic stop occurred.

14. Officers also observed, in the parking lot located at 503-A East Washington Street, Greensboro, North Carolina, a loaded Ruger P90 .45 caliber handgun (serial number 663-91996).

15. On or about October 21, 2024, Detective Kyle Denny of the Greensboro Police Department conducted a canvass of the surrounding area in an effort to located video evidence from the flight path. Detective Denny located video footage from United Institutional Baptist Church located at 802 East Market Street, Greensboro, North Carolina, near the location of the traffic stop. In the video CUNNINGHAM can be seen running south along the west side of the church.

16.     Detective Denny located additional video from The Pointe (referenced in paragraph 13).  The relevant footage appears to be motion and/or sound activated.[1]

17.     An examination of the video from Studio 503 shows that at 12:08:36 am (EST), there does not appeared to be any firearm laying in the parking lot.



Image from Studio 503, 503-A East Washington St

18.     At 12:09:34 am (EST), video surveillance from The Pointe shows CUNNINGHAM running past.

---

[1]The time stamp on the video is approximately 31 minutes and 21 seconds fast. The times referenced in the paragraphs below are the corrected time calculation of what the surveillance system displayed.



Image from 503-D East Washington Street, The Pointe

19.     Then, at 12:10:13 am (EST), after CUNNINGHAM is captured running by the
business, a firearm is visible in parking lot.



Image from Studio 503, 503-D East Washington Street







Images of the recovered firearm from Studio 503 parking lot, 503-D East Washington Street

20.     From information provided by the officers pursuing CUNNINGHAM, Detective

Denny's collection of video surveillance in the area and a review of that footage collected, the blue

line on the below map shows the flight path taken by CUNNIGHAM. The red dot at the top of the photograph is the general location of the traffic stop. The red dot at the bottom of the photograph is the general location where CUNNINGHAM was located and arrested.



21.     The recovered firearm was traced through the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). According to the ATF trace, CUNNINGHAM is not the original purchaser of that firearm. Telephone contact was made with the original purchaser who advised they moved within the past few years. Further, they advised that they had people helping with the move and believed some of their guns were stolen at that time. I confirmed with the original purchaser that they did not previously sell or give any of their firearms to an individual named Isaiah CUNNINGHAM. They confirmed that they did not and further stated that they did not even know anyone by the name of Isaiah CUNNINGHAM.

22.     During the course of this investigation, three cellular telephones were located. Two of the cellular telephones were claimed by Coleman and Little. The third cellular phone, a blue Apple iPhone, was located approximately fifteen feet from the front passenger side door of the vehicle and was not claimed by either Coleman or Little.

23.     During a custodial interview of CUNNINGHAM in which he was advised of and knowingly waived his *Miranda* rights, CUNNINGHAM stated that he had his cellular telephone with him at the time of the traffic stop. However, no phone was found on CUNNINGHAM's person

at the time of his arrest. Due to the location of where the blue Apple iPhone was discovered and the fact that it was not claimed by Coleman or Little, it is suspected that this cellular telephone belongs to CUNNINGHAM and was dropped during his flight from law enforcement.

24.     During the course of this investigation, an examination was conducted of open-source intelligence and social media to assist in gaining additional information on CUNNINGHAM.   A Facebook account was located with the profile name "Roccy Rollxn" (https://www.facebook.com/obey.zay.90/).   This account displays numerous pictures of CUNNINGHAM, including the cover images and profile picture.   This account also contains information and posts to support that the account belongs to CUNNIGHAM.

25.     Upon examination of the photographs visible on the account, members of law enforcement observed an image of CUNNINGHAM holding what appeared to be a handgun. The image is dated April 12, 2017, there is one visible comment on the image that reads "Get this shit of fedbook".



26.     Upon review of CUNNINGHAM's criminal history, CUNNINGHAM has the following firearm related convictions:

a.  Possession of a Firearm by Felon, from October 19, 2020 (United States District Court, Middle District of North Carolina); and

b.  Possession of a Firearm by Felon, from June 14, 2022 (United States District Court, Middle District of North Carolina).

27.  The North Carolina Department of Adult Corrections ("NCDAC") identified CUNNINGHAM as a "Crip" gang member and the Greensboro Police Department validated CUNNINGHAM as a "Rollin 20's" on or about July 31, 2019.

## TECHNICAL TERMS

28.  Based on my training and experience, I use the following technical terms to convey the following meanings:

29.  Cellular Telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log" which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic "address books," sending, receiving, and storing text messages and e-mails, talking, sending, receiving, and storing still photographs and moving video; storing and playing audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet.  Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

30.  Digital Camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images and videos.  Images can usually be retrieved by

connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

31.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records the locations it has visited. Some GPS navigation devices can give user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the earth. Each satellite contains an extraordinarily accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio waves, using specifications that are publicly available. A GPS antenna on earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

32.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send a receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media includes various types of flash cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

33.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

34.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

35.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

36.     Based on my training, experience, and research I know that the TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as evidence of the crime(s) themselves.

37.     Through my experience I have observed evidence in cellular devices such as pictures and text messaging that show subjects in possession of firearms. Often this includes photographs of the firearm(s), videos of the firearm(s), photographs and/or videos of individuals with the firearm(s), internet research of the firearm, messages regarding the purchase and/or sale of firearms, and possession and/or purchase of a firearm which at times include photographs and/or videos of the same.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

38.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

39.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET Devices were used, the purpose of their respective uses, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET Devices because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to

draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

40. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including computer-assisted scans of the entire medium, which might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant. Sometimes the standard way of retrieving forensic evidence from cellular telephones will not work. Accordingly, I request approval to use sophisticated methods such if necessary to extract data from the TARGET DEVICE. Some of these sophisticated methods may render the TARGET DEVICE unusable. Further, I also request the authority to send any of the TARGET DEVICE, if needed, out of the district to forensic and or cryptologic specialists for examination, unlocking, and decrypting of the devices.

41.    *Manner of execution.*    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET DEVICE described in Attachment A to seek items described in Attachment B, and for this Court to authorize execution of the warrant at any time in the day or night.


Respectfully submitted,


//S// Nicholas R. Ingram
Nicholas Ingram
Task Force Officer
Federal Bureau of Investigation


In accordance with Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this Affidavit.

The Honorable L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina